## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

MICHAEL CURRAN, individually and on behalf
of all others similarly situated,

    *Plaintiff*,

vs.

PROGRESSIVE DIRECT INSURANCE
COMPANY, an Ohio corporation,

    *Defendant*.

**CLASS ACTION**

**Case No. 1:22-cv-00878- -NYW-MEH**

**JURY TRIAL DEMANDED**

---

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

---

## I.    INTRODUCTION

This case is one of many materially identical cases against Progressive currently pending in courts around the country. Recently, the first ruling on class certification was issued by the Southern District of New York, which granted class certification of identical claims as those pled in this case. *See Volino v. Progressive Cas. Ins. Co*., 2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023). This Court should follow the *Volino* court's well-reasoned analysis and grant class certification of Plaintiff's claims against Progressive Direct Insurance Company.

Under basic appraisal standards, calculating the actual cash value ("ACV") of a vehicle using the comparable (or "comp") methodology is done by taking the average price of comparable vehicles, adjusted for verified differences between each respective comparable vehicle and the insured vehicle in mileage, equipment, and condition. Adjustments to the price of comparable vehicles cannot be based on unverified assumptions, to say nothing of purposely discarding and ignoring any data that undermines such assumptions. But that is precisely what Progressive does in determining the ACV of its insureds' vehicles by applying a "projected sale adjustment" to the list price of comparable vehicles, purportedly to reflect that consumers uniformly negotiate down the list price of used autos in cash transactions. They do not. In the modern used-auto market, dealers price vehicles to market and list vehicles for sale on the Internet at that market price. Data on millions of used car transactions confirm that vehicles typically sell for their list price. This case exists because Progressive ignored how the modern used auto market operates, ignored the empirical data of vehicle transactions, and ignored appraisal standards for calculating ACV, resulting in a uniform practice of undervaluing totaled vehicles.

It is undisputed that when insureds suffer a total loss to their vehicles, Progressive's form insurance policy ("Policy") requires payment of ACV, less any deductible. Progressive determines

ACV using the comparable or "comp" method, but it makes a critical departure from that otherwise industry-standard methodology: Before making adjustments to comparable vehicles based on verified differences in equipment, condition, and mileage, Progressive reduces the list prices of comparable vehicles by applying a "Projected Sold Adjustment" ("PSA") of ███ on average, that it (falsely) represents is the amount consumers can negotiate off the advertised price in a cash transaction. This speculative adjustment is invalid because it is not based on verified information— to the contrary, it is based on deliberately manipulated data—and, in fact, is based on a verifiably false assumption about the used car market.

Auto industry experts explain that Progressive's assumption—that dealerships overprice vehicles and consumers typically negotiate down from that advertised cash price—reflects a *long*-outdated understanding of the used car market. Given the ubiquity of Internet comparison shopping and the development of sophisticated pricing tools, car dealerships now aggressively price vehicles to market—meaning the list price must reflect the appraised cash market value—and advertise those prices online. After all, consumers who can compare advertised prices from their own home will never visit a dealership advertising an inflated price. This is confirmed by millions upon millions of used car transactional data, including Progressive's *own data*.

So how can Progressive possibly justify slashing the list prices of used vehicles used to determine ACV by (on average) ███? The answer is shocking: Progressive and its vendors calculated the PSA by supposedly comparing the advertised price of used vehicles to the amount they ultimately sold for, yet they excluded *every transaction where a vehicle sold for the Internet list price or a penny or more higher*. In other words, it simply discarded all data that undermined its foregone decision to reduce its insureds' ACV payments. When the 1-to-1 transactions (transactions where a vehicle sold for its list price) are considered, rather than discarded—in other

words, curing this single error in the data analysis—Progressive's data show the median vehicle sells for ███ of its advertised price. Attached as Exhibit 1 is a graphical portrayal of the sold-to-list ratio ("S/L Ratio") of millions of vehicles, which shows vehicles typically sell for list price.

Because Progressive and its vendors deleted from the data all transactions where a vehicle sold at or above its listed price, Plaintiff purchased a transparent data set of listed and sold vehicle prices. Plaintiff's expert matched millions of list-price and sold-price records by VIN number. This unadulterated dataset shows that vehicles typically sell for their advertised price, regardless of whether one measures typical as the mean, median, or mode of the transactions. This is significant: The empirical data confirm list prices equate to market value—just as the industry experts opine. All the evidence, then, is in accord. Plaintiff's expert's testimony that ACV is appropriately calculated by taking the average list price of comparable vehicles, adjusted for verified and documented variances in equipment, mileage, and condition is buttressed by overwhelming empirical evidence and used car industry expert testimony confirming that list price is the appropriate starting point.

In short, the PSA is capricious, arbitrary, and outright false. Class treatment will ensure that, after Plaintiff proves his case, insureds will receive the benefits they are entitled to and paid premiums to receive: the market value of their totaled vehicles. Once the PSA is excised from each Class member's detailed valuation report, the reports document a sound appraisal of ACV following the customary comp methodology. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *26 ("Progressive cannot dispute that applying every aspect of its valuation process other than the PSA leads to an accurate valuation[.]").

This case is eminently suitable for class treatment: Plaintiff's claims are based on (1) identical form contract language and (2) practices that applied uniformly across the Class. Plaintiff

believes the PSA deduction was always improper, while Progressive believes it was always proper. Whether a jury agrees with Plaintiff or Progressive, resolution of that question will resolve virtually the entirety of Class members' claims in a single stroke. Thus, this Court should grant certification of the Class proposed in Exhibit 7 and Exhibit 4 thereto.

## II.      RELEVANT FACTUAL BACKGROUND

### A.  Progressive's Form Policy Terms and Uniform Procedures

Progressive uses form insurance policies with materially identical language. Ex. 2 ("Retton Dep.") at 26-29.[1] In Section IV, Progressive promised to pay for "loss" to covered autos. Ex. 3 (Policy) at 16. In the "Limit of Liability" subsection, Progressive limits its liability to the vehicle's ACV, *id.* at 21, and states that ACV will be based on the "market value, age, and condition of the vehicle at the time the loss occurs," *id.* at 22. Plaintiff and Class members experienced what Progressive determined to be a total loss. Ex. 4 ("Silver Dep.") at 27, 30.[2] Consistent with its Policy terms, Progressive's uniform practice is to base total-loss payments on Mitchell's appraisal of the vehicle's ACV (albeit in an insufficient amount).

### B.  Progressive's Total-Loss Valuation Methodology

Progressive's methodology for valuing total-loss vehicles is to utilize a third-party vendor, Mitchell, to generate a vehicle valuation report. Retton Dep. at 37-38, 55-59. After an adjuster inputs the information, the report is generated through the Total-Loss WorkCenter ("WCTL"). *Id.* at 37-38, 40-42; Ex. 5 ("Kroell Dep.") at 20. Progressive used WCTL reports throughout the Class Period as its default method of calculating ACV. Retton Dep. at 37-38, 41-42, 55-59.

---

[1] By agreement of the parties, the deposition of John Retton taken in *Drummond, et al. v. Progressive Specialty Ins. Co., et al.*, 5:21-cv-04479-EGS (E.D. Pa.) and *Freeman v. Progressive Direct Ins. Co.*, 1:21-cv-03798-DCC (D.S.C.) is being used in lieu of retaking that deposition.
[2] By agreement of the parties, the depositions taken in *Volino* of Michael Silver, Phillip Kroell, and Blaine Bogus are being used in this case in lieu of retaking those depositions.

First, Mitchell identifying the listed price of comparable vehicles. *Id.* at 37, 51, 59. Then, it applies a PSA deduction to these list prices, purportedly to "reflect consumer purchasing behavior (negotiating a different price than the list price)." Retton Dep. at 42-43, 75; *see also* Ex. 6 ("Plaintiff's Report") at 9. In other words, Progressive's position is that car dealerships uniformly price vehicles above market and negotiate down to the actual market value—thus, according to Progressive, the list prices must be reduced by (on average) ███. The new "price"—reduced by the PSA—of each comparable vehicle is then adjusted based on observed and documented differences, if any, in mileage or equipment. Kroell Dep. at 142-143. The average of the adjusted prices constitutes the "base" market value. *Id.* at 144-45. From there, Mitchell adjusts the base value amount based on the insured vehicle itself—if the total-loss vehicle was in below- or above-average condition, for example—which establishes what Progressive represents is the "adjusted" market value. *Id.* at 145. Finally, any taxes, fees, and deductible are automatically calculated and applied, which becomes the ultimate claim payment amount. Retton Dep. at 74. Progressive maintains this data in its electronic claims file system. Ex. 7 ("Lacey Report") at 9-12.

### C. Imposing a PSA is Inconsistent with Market Realities and Appraisal Standards

Progressive's assertion that list prices of comparable vehicles are bloated and that consumers routinely negotiate advertised prices down is belied by market forces. Plaintiff's industry expert explains this position is an outdated and false characterization of the market. Ex. 8 ("Felix Rep.") at 2-3. *Many* years prior to the Class period, it was perhaps a fair characterization of market forces: Without Internet advertising and sophisticated pricing tools, a vehicle's "sticker" price was not really a factor—consumers went to the local dealership with the desired vehicle type and could not easily compare listed prices across numerous dealerships. *Id.* at 3. Now, not only can dealers identify the precise amount at which comparable vehicles are listed in the market, so

too can consumers—and if the dealership prices above market, consumers will know it and will patronize competing dealerships who priced to market. *Id*. at 3-5.

This does not mean vehicles invariably sell for the precise listed price. Used-car transactions are structured in numerous ways that cause a vehicle's sold price to be reported as less than (or more than) the advertised price, but are unrelated to actual **cash** value. For example, a dealership might sell a vehicle for less than list price if, inter alia, (1) they are getting points on a loan; (2) there is a special discount (military, employee, friends/family); (3) a consumer is entitled to apply a "credit" earned through use of the service department; or (4) the purchaser had an attractive trade-in that incentivized the dealership to sell at a below-market price so as to obtain the trade-in vehicle; or (5) the consumer found a previously-unidentified defect. *Id*. at 6-8. But these reasons "have nothing to do with the actual market price of a vehicle." *Id*. at 8.

Additionally, Plaintiff's appraisal expert explains the "comp" methodology Progressive utilizes is a line-item method to arrive at the ACV of damaged property, pursuant to which appraisers take the list prices of comparable vehicles and make line-item adjustments for documented differences between the comparable vehicle(s) and insured vehicle in mileage, equipment, and condition. Ex. 9 ("Merritt Rep.") at 2-4. Any adjustment must be based on observed, documented, and verified data. *Id*. Other than the PSA, Mitchell's method is consistent with this standard and documents a detailed, sound appraisal of each loss vehicle that Progressive presents to the insured as ACV. *Id*. at 7-9.

But Progressive deviated from proper appraisal standards in applying the PSA. *Id*. at 4-7. Because the PSA is not based on observed, verified data, it is inconsistent with proper appraisal standards. *Id*. at 6-7. As Merritt explains, the proper method for identifying a vehicle's ACV is to take the average price of comparable vehicles, adjusted for documented differences in mileage,

condition, and equipment. *Id*. at 2-4. As such, the market value of every Class member's vehicle is identified in the valuation reports. *Id.* at 7. Simply remove the PSA deductions, and the detailed valuation report identifies the vehicle's ACV. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *26.

### D. **To Calculate the PSA, Progressive Ignores and Deletes Market Data That Disproves Its Market Theory**

Notwithstanding these market realities and standards, Progressive imposes a PSA deduction that averages ███████████████████ Lacey Report at 13. This is based on a manipulation (and then misrepresentation) of the data.

Here's how it works: Mitchell hires Blaine Bogus and a three-person team (the "Bogus Team") at J.D. Power to calculate the PSA. Ex. 10 ("Bogus Dep.") at 17-18. Mitchell provides the Bogus Team with advertised price data gathered from Internet advertisements. *Id*. at 21. The Bogus Team compares that data to sales data from its "Power Information Network" ("PIN") of dealers. *Id*. at 21-22. The Bogus Team's data is a black box. Neither Progressive nor the Bogus Team has conducted any analysis to determine whether the PIN dealers are representative of the used vehicle market but, instead, "assum[e] it would be reflective of the general market." Bogus Dep. at 155:18– 156:16. J.D. Power refuses to disclose any dealership from which it obtains such data and has designated it as "Highly Confidential—Outside Counsel's Eyes Only." Nevertheless, Progressive accepts the PSA without question as a basis for reducing its insureds' ACV payments.

The most shocking part of this scheme is that, in calculating the PSA, the Bogus Team simply excludes from the data all transactions where the sales price exceeds the list price and, until July 2021, excluded every transaction where the vehicle sold for list price. Bogus Dep at 57-60; Lacey Report at 3-5. This bears repeating: The Bogus Team made the spurious assumption that transactions at or above list price are outliers, notwithstanding that it never conducted a single analysis to determine how often those purported "outliers" occur and, in fact, had no idea how

many records were being excluded. Bogus Dep. at 57-58, 61-63. A simple analysis shows that transactions selling at list price constitute █████ *of the transactions* in the PIN data. Lacey Report at 4. Discarding and deleting data because of an undesirable (to Progressive) but relevant characteristic invalidates the data. *Id*. Correcting for the single deliberate error of omitting transactions at list price results in a negligible ███ variance between sold and list prices. *Id*. & Exhibit 8 thereto at 2.

And this does not even account for transactions where the sold price exceeded the list price by a penny or more, which the Bogus Team also discarded, keeping no record of how many transactions it excluded from the data. Bogus Dep. at 137; Lacey Report at 4-5. For a vehicle to sell for higher than its listed price is not an outlier or an oddity. Felix Rep. at 8-10. Mr. Martin identified that 23.47-29.93% of vehicles were reported to the DMV as sold for more than listed price. Ex. 11 (Martin Rep.) at ¶¶ 25, 27, 30, 32, 34, 37, 39, 41, 44, 46, 48, 51.

Moreover, the Bogus Team does not account for transactions involving a military/employee/family discount, purchase financing, or other reasons a sold price might be less than list price but are unrelated to a vehicle's cash market value. Bogus Dep. 73:22–75:5. Instead, after tossing transactions selling at list price or a penny more, the Bogus Team credulously accepts that *any difference* up to a staggering ████ between list and sold price is the product of negotiation in a cash transaction, despite never taking any effort to determine whether that is true. *Id*. at 74:20–75:5. Consider that one of the primary reasons a vehicle might sell for less than list price is that a dealership simply offered less than it otherwise would have on a vehicle trade-in—or it might be incentivized to sell for a below market price because the purchaser has an attractive trade-in. Felix Rep. at 6-7. Not only are these instances unrelated to actual market value, they are irrelevant in the

context of total-loss insureds, as they have no vehicle to trade in.[3] Also, instances where a dealership might chop a few hundred dollars off list price because the consumer is financing the purchase through the dealership—meaning it will more than make up the profit difference—are irrelevant because Progressive owes actual ***cash*** value, not actual financed value. And that some people may be entitled to a discount is irrelevant to the ***actual*** cash value.

Unfortunately, Progressive's vendors claim they no longer have the full transactional data and thus cannot calculate the actual difference (if any) between sold and list prices when considering all transactions. So Plaintiff retained a statistician, Jeffrey Martin, to analyze a large set of transparent data reported by all dealers to state DMV offices. Mr. Martin identified a robust sample size of 1.4 million-2.4 million matches *per year*. Martin Rep. at ¶¶ 25, 32, 39, 46. The results confirm Mr. Felix's testimony: The median vehicle sale is for the advertised price, regardless of whether all transactions are considered or if outlier ranges are applied. *Id*. at ¶¶ 25, 27, 30, 32, 34, 37, 39, 41, 43, 46, 48, 51. The average vehicle sale is a negligible 99.5% (meaning sold prices were, on average, a mere 0.5% lower than listed prices) at most. *Id.* at ¶¶ 34, 37, 41, 43, 48, 51, 54, 57. These findings confirm that list price equates to market value and, thus, that the PSA deduction is invalid. These results are summarized in the figures and tables in Exhibit 1.

In short, instead of looking at the data honestly, Progressive and its vendors began with a forgone conclusion: "Consumers negotiate down the advertised cash price of a vehicle." They then manufactured "support" and thumbed the scale by ignoring and deleting all market data to the contrary. Once this lone invalid adjustment is removed, each Mitchell Report documents a good

---

[3] There are numerous other flaws in the Bogus Team's analysis, as set forth in Dr. Lacey's Report and the Appendix thereto. Critically, Dr. Lacey, for purposes of the Appendix, essentially adopted the Bogus Team's assumptions and demonstrated that even accepting such flawed assumptions, the Bogus Team's analytical approach does not faithfully represent the data.

faith appraisal of each Class Member's loss vehicle. Certifying this case for class treatment is proper under well-established law, *see, e.g.*, *Volino*, 2023 U.S. Dist. LEXIS 44666, at \*37-40, and will ensure Class Members receive the ACV they are entitled to, and paid premiums for, under their Policies.

### III. ARGUMENT

When considering a motion for class certification, a court must first determine whether the proposed class satisfies Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation. The court should then examine the Rule 23(b) standards and determine whether the proposed class meets at least one of the requirements regarding the categories of classes maintainable as a class action. *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1187 (10th Cir. 2006). While courts are required to conduct a "rigorous analysis," *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982), "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Re. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). Instead, "[merits] questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites…are satisfied." *Id*. at 1195; *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982).

Certification should be denied only upon a "clear showing" that the plaintiff did not meet the Rule 23 requirements. *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 (2d Cir. 1968). Any doubts should be resolved in favor of class certification. *See Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968); *Rhodes v. Nat'l Coll. Sys., Inc.*, 317 F.R.D. 579, 582 (D. Colo. 2016) ("doubts as to the propriety of entertaining a class action should be resolved in favor of certification").

### A. **The Class Is Sufficiently Numerous**

Recently, the Tenth Circuit held that Rule 23 carries with it the requirement that class members be ascertainable. *Evans v. Brigham Young Univ.*, 2023 U.S. App. LEXIS 11050, at \*8

(10th Cir. May 5, 2023). Rather than a free-floating independent requirement, however, the Court explained it is simply part of the Rule 23(a)(1) numerosity analysis. *Id*. "To show numerosity, 'there must be presented some evidence of established, ascertainable numbers constituting the class...'" *Id*. (quoting *Rex v. Owens ex rel. Oklahoma*, 585 F.2d 432, 436 (10th Cir. 1978)). This requires "defining classes clearly and with objective criteria." *Mullins v. Direct Dig., Ltd. Liab. Co*., 795 F.3d 654, 657 (7th Cir. 2015). In turn, the number of ascertainable class members must be such that joinder is impracticable. Fed. R. Civ. P. 23(a)(1). While there is no magic number, courts routinely find the numerosity requirement is satisfied so long as there are a few dozen class members. *See, e.g.*, *Felps v. Mewbourne Oil Co.*, 336 F.R.D. 664, 670 (D.N.M. 2020) (60 class members met numerosity requirement).

As detailed in Dr. Lacey's Report at pages 9-12, the parties and the Court can determine if someone is a Class member based on objective, identifiable criteria in the electronic claims data maintained by Progressive. Every criterion for membership—insured by Progressive, date of loss, whether it was a covered total-loss claim, whether it was based on a Mitchell Report, and whether a PSA was applied—is objective, not subjective criteria such as state of mind. *Compare, e.g.*, *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 97 (S.D.N.Y. 2009) ("An identifiable class exists if its members can be ascertained by reference to objective criteria") *with Simer v. Rios*, 661 F.2d 655, 659 (7th Cir. 1981) (class members could not be identified absent the "Sisyphean task" of deciphering their state of mind).

Courts have explained that ascertainability is not defeated simply because it may necessitate a manual review of individual claims files. *E.g.*, *Banks v. Cent. Refrigerated Servs.*, No. 2:16-CV-356-DAK, 2017 U.S. Dist. LEXIS 67423, at *5 (D. Utah May 2, 2017) (class was ascertainable notwithstanding the need to use individual business records to identify class

members because review of individual records did not require "extensive and individualized fact finding" and "mini-trials"); *see also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539-40 (6th Cir. 2012) ("Plaintiffs' classes are defined by classic categories of objective criteria . . . the need to manually review files is not dispositive. If it were, defendants… could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained."). Here, Class members can be identified based *solely* on Progressive's records—and although it may require looking at individual Reports, this does not preclude certification. *See id.*

In turn, this ascertainable evidence establishes there is approximately 15,000 members of the Class. Lacey Rep. at 12. While this may be slightly overinclusive,[4] it nevertheless easily satisfies Rule 23(a)(1).

## B. <u>Common Issues Predominate</u>

Under Rule 23(a)(2), there must be questions common to the class, meaning there is at least one question the answer to which "will resolve an issue that is central to the validity of [each claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Issues which satisfy the commonality inquiry are those where the same evidence suffices for each class member or there is a central issue susceptible to class-wide proof. *Tyson Foods, Inc. v. Bouphakeo*, 577 U.S. 442, 453 (2016) (citing 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196-97 (5th ed. 2012)). In turn, the common issue(s) must predominate over issues that can only be satisfied through individual proof. Not all issues need be common to the class; rather, "the predominance prong asks

---

[4] In approximately 4% of Reports, Progressive does not apply a PSA to any comparable vehicle, meaning that insured would not be a Class member. While these insureds would not be identified until the claims administration portion of the litigation should Plaintiff prevail on the merits, it is acceptable and normal to send notice to a somewhat overinclusive class list. *See, e.g.*, *Wesley v. Snap Fin., LLC*, 341 F.R.D. 72, 76 (D. Utah 2022) ("That the [class] list is overinclusive, and therefore individual notice will include some non-class members, does not violate the requirements of Rule 23(c)(2)(B) nor interfere with its purpose.").

whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (quotations omitted). Importantly, "the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013).

**1. Courts consistently find that common issues predominate in cases where insureds present common proof that a discrete element of the ACV calculation constitutes a breach of contract.**

It is worth noting at the outset that where insureds proffer common proof that a discrete portion or element of an ACV calculation is illegitimate and constitutes a breach of contract, courts consistently find that class treatment is appropriate—including, most notably, in the *Volino* case addressing claims materially identical to the claims here. U.S. Dist. LEXIS 44666, at *24 (where plaintiffs challenged a PSA reduction to the list price of comparable vehicles, the "critical common questions identified by Plaintiffs predominate over those individual inquiries"); *Slade v. Progressive Sec. Ins. Co.*, 2014 U.S. Dist. LEXIS 154713 (W.D. La. Oct. 30, 2014) (common issues predominated where insureds challenged base value calculation of totaled vehicles*) rev'd on other grounds* 856 F.3d 408 (5th Cir. 2017); *Shields v. State Farm Mut. Auto. Ins. Co.*, No. 6:19-cv-1359, 2022 WL 37347, at *7-8 (same); *Sampson v. United Services Automobile Association*, Case No. 6:19-cv-896, 2022 WL 1415652, at *8 (W.D. La. May 3, 2022) (same); *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 459 (6th Cir. 2020) (the common question of "whether State Farm breached Plaintiffs' standard-form contracts by deducting labor depreciation from their ACV payments" predominated over individualized issues); *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 376 (8th Cir. 2018) (affirming class certification, noting that the parties generally agreed with the methodology for determining ACV and "only dispute is over including

labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified."); *Mitchell v. State Farm*, 954 F.3d 700, 710–712 (5th Cir. 2020) (whether State Farm breached the contract by depreciating labor predominated over any individual questions pertaining to other portions of the ACV calculation); *Paris v. Progressive Am. Ins. Co.*, No. 19-21761-CIV, 2020 U.S. Dist. LEXIS 212127 at *18 (S.D. Fla. Nov. 13, 2020) (the questions of "whether the policy language requires Progressive to pay sales tax and transfer fees as part of the ACV of a vehicle are common to all class members") (cleaned up); *Sos v. State Farm Mut. Auto. Ins. Co.*, No: 6:17-cv-890-Orl-40LRH, 2019 U.S. Dist. LEXIS 139680, at *10 (M.D. Fla. May 2, 2019) (same); *Lewis v. Gov't Employees Ins. Co.*, 2022 WL 819611, at *8 (D.N.J. March 18, 2022) (whether application of a discrete adjustment constituted a breach and whether failure to include sales tax in ACV were common, predominating issues).

This case is no different. As set forth below, Plaintiff has common evidence that application of the PSAs constitute a breach of contract. As such, like in all these cases (and others) challenging a discrete element of the ACV calculation through common evidence, common issues predominate.

## 2. The elements of the breach of contract claim that are subject to common evidence predominate over any individual questions.

Commonality is satisfied because whether Progressive's application of the PSA to comparable vehicles' listed prices constitutes a breach of the form Policy is subject to common evidence and, thus, its answer will apply equally to all Class members. And in turn, these common issues predominate over any individual issues. The elements of breach of contract under Colorado law require evidence of "(1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) damages." *Lawson v. Heartland Payment Sys.*, *LLC*, 548 F. Supp. 3d 1085, 1095 (D. Colo. 2020).

It cannot be disputed that the first two elements are subject to common proof, as Progressive has already identified every total-loss insured covered by its policies during the relevant period and there is no dispute that if Progressive deemed a claim to be covered and therefore issued a claim payment, the insured had performed under the contract.

Whether a breach occurred and, if so, the measure of damages are also subject to common evidence. First, whether a breach occurs turns on whether the PSA is "contrary to industry practices and consumer experiences and therefore not reflective of the vehicle's fair market value," meaning that by applying the PSA, Progressive "did not consider the [vehicle's] fair market value; it considered an artificially lower value, in breach of its contractual duty." *Smith v. State Farm Bureau Cas. Ins. Co.*, 18 F.4th 976, 980-81 (8th Cir. 2021) (cleaned up); *see also Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:20-cv-2482-TLP-cgc, 2022 WL 17592417, at *6 (W.D. Tenn. Sept. 26, 2022) (denying insurer's motion for summary judgment on breach-of-contract claim where insurer utilized a uniform deduction to supposedly account for consumer negotiating behavior and stating "[t]he issue here [] is whether Defendant knowingly and without explanation reduced the cash value for Plaintiff's total loss vehicle using a single line-item deduction in its routine claims-settlement practice"). The answer to this question is subject to common evidence, namely (i) the form Policy language applicable to every Class member, which establishes the relevant duties;[5] (ii) expert testimony that dealerships price to market, meaning the list price of comparable vehicles is reflective of cash market value, as confirmed by even Progressive's own purposely truncated market data and by the DMV data; and (iii) expert testimony that the PSA is therefore not reflective of the used car market and is capricious, arbitrary, and baseless.

---

[5] It is not disputable that all Class members were subject to the same Policy language and business practices. Retton Dep. at 26-29.

The next question is whether Plaintiff can proffer a common methodology for calculating ACV by considering actual market value, rather than the "artificially deflated" value which constituted a breach of Progressive's contractual obligations. The answer is yes: Merritt will testify that ACV is calculated by taking the average of comparable vehicles, adjusted for differences in mileage, equipment, and condition—in other words, the Mitchell method but without the PSA. So, Merritt does not have to identify comparable vehicles for each Class member, because Mitchell has already done so; Merritt does not have to evaluate and calculate condition adjustments for any Class member's vehicle, because Mitchell has already done so; Merritt does not have to identify and calculate any mileage adjustments, because Mitchell has already done so; and so forth. As such, not only can Plaintiff establish a *method* for calculating ACV based on common proof, he can identify the base market value and ACV of every Class Members' vehicle based on Progressive's records alone. Moreover, Plaintiff can buttress this testimony with common evidence: extensive empirical evidence that used autos typically sell for list price and Mr. Felix's testimony that in the modern market, dealerships price vehicles to market, both of which support using list prices as the starting point for calculating ACV. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *22 ("[T]he key question for both claims and for all classes and subclasses is, in substance, whether the PSA reflects how cars are valued and sold in the market."). Resolving this issue is the crux of this case and will resolve the dispositive issue in every Class members' claim.

In sum, Plaintiff will proffer a uniform method of calculating ACV—namely, the very methodology utilized by Mitchell but without the PSA, because of common evidence that it is invalid, conflicts with market forces and vast empirical evidence, and is not a proper element in

calculating ACV.[6] For this reason, a court analyzing materially identical claims had little difficulty in finding common issues were likely to predominate and class treatment was appropriate. *Volino*, U.S. Dist. LEXIS 44666. In *Volino*, like here, Progressive calculated ACV by taking the average price of comparable vehicles, adjusted for documented differences in options, mileage, and equipment. *Id*. at *9. But also, like here, it applied the capricious and baseless PSA to the list price of comparable vehicles. *Id*. And like here, the plaintiffs claimed this adjustment was based on rigged, cherry-picked data, conflicted with actual market forces, and was inconsistent with sound appraisal methodology. *Id*. Based on the evidence presented—which is the exact same evidence presented here—the court found "the critical common questions identified by Plaintiffs predominate over [any] individual inquiries." *Id*. at *24. After all, "[i]f the factfinder accepts Plaintiffs' evidence on the state of the market, then simply recalculating the valuation using Progressive's methodology without the PSA will accurately value each class member's vehicle." *Id*. at *27.

As shown in Sec. III(B)(1), the *Volino* analysis mirrors numerous other courts finding predominance of common issues is established in the context of breach of form insurance contracts where the plaintiff claims underpayment of ACV for a discrete reason. *E.g.*, *Hicks*, 965 F.3d at 459; *Stuart*, 910 F.3d at 376; *Mitchell*, 954 F.3d at 710–711; *Shields*, 2022 WL 37347, at *7-8;; *Sampson*, 2022 WL 1415652, at *8; *Paris*, 2020 U.S. Dist. LEXIS 212127, at *18; *Sos*, 2019 U.S.

---

[6] In California and Washington, Progressive utilizes Mitchell but does not apply the PSA. Suppose a class action was brought where insureds had to establish the value of their vehicles—for example, because Progressive had allegedly improperly denied the claims. If the insureds utilized the average of the list prices of comparable vehicles, adjusted for any differences in options, mileage, and condition, all as calculated by Mitchell, this would obviously be common proof. That is precisely what Plaintiff is doing here—the only difference being that the PSA must be subtracted, whereas in the California and Washington hypothetical, it would never have been applied in the first instance.

Dist. LEXIS 139680, at *10. Respectfully, there is no reason to deviate from these well-reasoned opinions. The predominating question in this litigation is common to the Class, namely, whether application of a baseless and statistically invalid PSA to the listed price of comparable vehicles is permitted by the form Policy. As such, liability issues subject to common proof predominate over any issues subject only to individual proof.

### 3. The elements of a for bad faith are subject to common proof that predominate over any individual questions.

Predominance is also satisfied with respect to Plaintiff's claim that Progressive violated its covenant of utmost good faith and fair dealing. "[A]n insurer's breach of the duty of good faith and fair dealing gives rise to a separate cause of action arising in tort." *Goodson v. Am. Standard. Ins. Co. of Wis.*, 89 P.3d 409, 414 (Colo. 2004) (internal citation and quotation marks omitted). To prevail on a bad faith claim, the insured must prove "(1) the insurer's conduct was unreasonable, and (2) the insurer either had knowledge of or reckless disregard for the fact that its conduct was unreasonable." *Kisselman v. Am. Fam. Mut. Ins. Co.*, 292 P.3d 964, 970 (Colo. App. 2011). The tort of bad faith breach of an insurance contract encompasses an entire course of conduct and is cumulative. *Dale v. Guar. Nat. Ins. Co.*, 948 P.2d 545, 551 (Colo. 1997).

As stated above, all Class members were subject to the same course of conduct. Progressive exercised its discretion in applying uniformly negative PSA deductions whose only purpose was to reduce the amount paid to insureds as ACV. Progressive made these deductions only by first purposely discarding all data that did not support its foregone conclusion. Moreover, it made this decision without undertaking any investigation or analysis into whether the PSA is legitimate, reflects market forces, is based on sound empirical data, or even attempts to control for variables in the market. It cannot be disputed that if these failures constitute unreasonable behavior and if

Progressive's failure to conduct any analysis or investigation into the propriety of the PSA constitutes "reckless disregard," they do so as to all members of the Class.

### 4. Plaintiff's damages model fits his theory of liability, and any individual issues of damages cannot predominate over common issues of liability.

As set forth above, whether Progressive breached the contract by failing to consider actual market value in calculating ACV can be shown through common proof. Next, the measure of damages can also be shown through common proof, and that measure of damages fits Plaintiff's liability theory. Plaintiff's theory on the merits is that, because an honest look at vast empirical data, consistent with expert testimony from those with knowledge of how the used auto market works, confirms that vehicles typically sell for their list price, and because any adjustments to the price of comparable vehicles must be based on verified information, not foregone conclusions, the listed price of comparable vehicles adjusted for differences in mileage, options, and condition (which Plaintiff does not challenge) constitutes the actual cash market value of an insured vehicle. If a jury agrees, damages are a ministerial calculation: the difference between the Market Value calculated in each Class Member's Mitchell Report with the PSA deductions and without those deductions, plus applicable sales tax on that difference and prejudgment interest. Merritt Rep. at 7-8; Lacey Rep. at 12-14; *see also* Newberg on Class Actions § 12:2 ("a common method for showing individual damages—a simple formula could be applied to each class member's … records—[is] sufficient for the predominance [] requirement[] to be met.").

This damages model is consistent with Plaintiff's theory of liability. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *32 ("Because Plaintiffs take the position that the PSA should not exist at all, a damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory."). Other than the application of the PSA, Plaintiff agrees with how ACV was calculated by Mitchell, *i.e.*, the "comp" method. *See* Merritt Rep. at 7. Numerous cases across

the country—including in the more complicated context of real-property disputes—have been certified as class actions where plaintiffs presented evidence that one step in a multistep appraisal process is improper and proposed a damages model of excising the offending portion.

In *Volino*, the court granted class certification on identical facts. 2023 U.S. Dist. LEXIS 44666. There, as here, plaintiffs challenged Progressive's application of PSA deductions. *Id.* at *7. There, as here, plaintiffs alleged the PSAs were unfounded and illegitimate. *Id.* And there, as here, plaintiffs' expert opined that Progressive's reports documented a sound appraisal of ACV following a comp methodology once the PSAs are removed. *Id.* at *11. Thus, the court found that plaintiffs' "damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory." *Id.* at *32. This is precisely the case Plaintiff is bringing here.

Courts have similarly sustained class treatment where insureds challenged discrete components of ACV appraisals. For example, in *Slade*, the plaintiffs alleged Progressive used an invalid source to calculate the base value—that is, before condition adjustments are made based on inspection of the loss vehicle—of their totaled vehicles. 856 F.3d at 411. Like here, the plaintiff did *not* contend that the entire valuation must be scrapped, but only the offending portions. *Id*. The court found the theory of liability and damages matched. *Id*. at 411 ("there is no principled reason why" Progressive's own unchallenged adjustments could not be applied to the new, properly calculated base value to determine the damages amount); *accord Volino*, 2023 U.S. Dist. LEXIS 44666, at *33-34. The only distinction here is one without a difference: Rather than scrapping the base value wholesale and substituting another source in its place, Plaintiff's evidence will show that, like in *Volino*, the offending PSA deductions can simply be excised from the base value calculation, keeping the other (valid) components of the valuation. Notably, lower courts applying *Slade* have had little difficulty certifying for class treatment claims challenging a single problem

with an ACV determination and putting on evidence of how to fix that problem, while keeping the non-offending portions. *Shields*, 2022 WL 37347, at *8; *Sampson*, 2022 WL 1415652, at *8.

Likewise, the Fifth, Sixth, and Eighth Circuits have affirmed class certification in the more complicated real-property context where plaintiffs challenged one step in a multistep appraisal process and proposed a damages model of excising the offending portion of the valuation. *See, e.g.*, *Hicks v. State Farm*, 965 F.3d 452, 460–61 (6th Cir. 2020); *Mitchell v. State Farm*, 954 F.3d 700, 710–711 (5th Cir. 2020); *Stuart v. State Farm*, 910 F.3d 371, 375–76 (8th Cir. 2019). In *Hicks*, the plaintiffs alleged State Farm failed to properly calculate ACV by improperly deducting labor depreciation. 965 F.3d 452. There, as here, the plaintiffs' theory of liability was that, but for this one improper line-item adjustment, they would have received a proper payment of ACV. *Id.* at 456. And, as here, they presented a damages model that excised that single deduction. *Id.* at 460.

As these courts explained, class treatment of claims challenging a single line-item deduction is proper even if insurers argue there may have been an *over*payment as to an unchallenged aspect of the ACV calculation. In *Hicks*, State Farm argued that even if it were not permitted to depreciate labor, "it may have miscalculated ACV payments based on individualized errors unrelated to depreciating labor costs" and these errors may have exceeded the depreciation amount. *Id*. at 460. "Put another way, State Farm intends to defend against the claims of individual class members by proving that some insureds were not damaged because it either overestimated ACV payments to such a degree that the deduction of labor depreciation resulted in no damages or it mistakenly reimbursed labor depreciation costs to RCV claimants for more than they were owed." *Id.* The Sixth Circuit rejected this argument because "'any overestimation . . . simply operates as an error in the insured's benefit.'" *Id*. at 461 (quoting *Stuart,* 910 F.3d at 376-77*).* And even if "this sub-issue were to become relevant at the merits stage," it might be resolvable through

subclasses or bifurcation. *Id.* at 462. Likewise, in *Mitchell*, the Fifth Circuit stressed that "whether State Farm made an error in estimating" other elements of the ACV calculation "is a question separate from this class litigation," and left it to the district court to determine "how to handle sub-issues that may or may not arise in granting class relief." 954 F.3d at 711. Finally, in *Stuart*, the Eighth Circuit also rejected State Farm's argument, holding that "the only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified." 910 F.3d at 376. All of this is consistent with *Volino*, which explained that arguments that Progressive may have overvalued some other aspect of the ACV calculation "are speculative and would not defeat predominance even if they were relevant." 2023 U.S. Dist. LEXIS 44666, at *29.

Here, the clearly predominant question is whether Progressive's application of the PSA means it was not considering market value and was instead considering an artificially deflated value. *See Smith*, 18 F.4th at 980-81. If so, the clear remedy—just as in the numerous cases discussed above—is awarding damages calculated by considering actual market value, which means backing out the invalid PSA deduction from the Mitchell reports. But even if this Court or the jury rejects such measure of damages, class certification is appropriate—at that point, this Court would possess a number of options, including notifying Class members that the jury determined Progressive breached its contract by failing to consider market value, but that each Class member may need to take additional steps to establish individual damages. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001). And "the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Wallace B. Roderick*, 725 F.3d at 1220.

In sum, Plaintiff's claims are "sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 632 (1997).

### C. **The Remaining Rule 23(a) Prerequisites Are Met**

The remaining Rule 23(a) prerequisites—typicality and adequacy—are also met. Under Rule 23(a)(3), typicality is established where the plaintiff's claim arises from the same events giving rise to the class members' claims and are based on the same legal theory. "So long as there is a nexus between the class representatives' claims or defenses and the common questions of fact or law which unite the class, the typicality requirement is satisfied," and the "positions of the named plaintiffs and the potential class members do not have to be identical." *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 551 (D. Colo. 1998) (internal citation and quotation marks omitted).

It is undisputed that the form Policies contain identical language, and that Progressive applied a PSA to the listed price of comparable vehicles for every Class Member, which is the practice that gave rise the claim. *See* Lacey Rep. at 9-12 and Exhibit 4 thereto. This case will turn on whether this uniform practice is authorized by the plain language of the Policy. The claims arise from the same challenged conduct and share the same essential characteristics, which satisfies the typicality requirement. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *19-21 (rejecting Progressive's challenges to typicality and finding that, "[c]ontrary to Progressive's argument, the named Plaintiffs' claims, and Progressive's related defenses, are typical of the class as a whole.").

Plaintiff also satisfies the Rule 23(a)(4) adequacy requirement, which "dovetails with the last in that typicality ensures that the class representative's claims resemble the class' claims to an extent that adequate representation can be expected." *Schwartz*, 178 F.R.D. at 552. The adequacy prerequisite requires merely that "the representatives and the class members must share common

objectives and legal or factual positions and only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Id.* (cleaned up).

Plaintiff has a personal interest in the outcome of this case, has presented no claims that would be detrimental to the Class interests, and all Class members would benefit from a finding that the PSA is improper and constitutes a breach. Further, Plaintiff retained qualified counsel who have experience litigating class action cases and are committed to expending the resources necessary to prosecute this claim. Ex. 12 ("Bates Decl.") at ¶¶ 2-4. Both Rule 23(a)(4) and Rule 23(g) are satisfied. *See* Fed. R. Civ. P. 23(g)(1); *see also Volino*, 2023 U.S. Dist. LEXIS 44666, at *21 ("Contrary to Progressive's argument, 'the representative parties will fairly and adequately protect the interests of the class.'").

### D. <u>Class Treatment Is Superior</u>

Factors relevant to determining whether class treatment is superior to other forms of adjudication are: (A) any interest in individually controlling prosecution; (B) whether any litigation has already commenced; (C) the desirability of concentrating litigation; and (D) manageability. Fed. R. Civ. P. 23(b)(3).

Here, Plaintiff's damages are less than $1,500. Lacey Rep. at 12. This is a relatively small amount compared to the cost of litigating against a large insurance company. In *Amchem*, the Supreme Court noted that the central policy underlying the class action mechanism is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." 521 U.S. at 617 (citation omitted). "The class action is an ingenious device for economizing on the expense of litigation and enabling small claims to be litigated.'" *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 744 (7th Cir. 2008). Plaintiff is unaware of any other litigation in Colorado against Progressive raising these claims—and even if

there were, it would nevertheless be desirable to concentrate litigation of these claims into one court and in one action for purposes of efficiency and judicial economy. Fed. R. Civ. P. 23(b)(3)(c).

Finally, class treatment is manageable. Liability will be established through common evidence of Progressive's uniform Policy provisions and method for valuing total loss claims. Even if management was likely to be difficult—it will not be—the relevant comparison is to individual litigation, not to no litigation at all. *See Mullins*, 795 F.3d at 672. For this reason, a manageability concern "will rarely, if ever, be in itself sufficient to prevent certification of a class." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1272 (11th Cir. 2004). There is no question that class treatment is more manageable than 15,000+ individual cases. Here, there are no manageability concerns—identifying Class members is formulaic and based on objective, verifiable data in Progressive's records. Lacey Rep. at 9-12. All evidence has been gathered and, except for deposing Progressive's experts, if necessary, discovery is closed. All that remains once a class is certified is notifying the Class members, briefing on any issues that may be resolvable at summary judgment, and then a trial. If the jury agrees with Plaintiff's evidence on the state of the market—as reflected through expert testimony and empirical data—and, thus, finds that the PSA is illegitimate and list prices are an appropriate starting point when calculating ACV, identifying the damages amount by excising the PSAs will be ministerial and formulaic. If the jury disagrees with Plaintiff's evidence, the claims of all Class members will fail in a single stroke. Either way, this case—and a trial—will be eminently manageable as a class action.

Accordingly, classwide adjudication is the superior method for resolving this dispute.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff's Motion should be granted.

Respectfully submitted,

Dated May 26, 2023

**SHAMIS & GENTILE, P.A.**

*/s/Andrew J. Shamis*
Andrew Shamis
14 N.E. 1st Avenue, Suite 705
Miami, FL 33132
(305) 479-2299
ashamis@shamisgentile.com

**NORMAND PLLC**
Jacob L. Phillips
Florida Bar No.: 120130
Post Office Box 1400036
Orlando, FL 32814-0036
Telephone:(407)603-6031
jacob.phillips@normandpllc.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg
Chris Gold
20900 NE 30th Avenue, Suite 417
Aventura, FL 33180
(786) 289-9471
scott@edelsberglaw.com
chris@edelsberglaw.com

**CARNEY BATES & PULLIAM, PLLC**
Hank Bates
Lee Lowther
519 W 7th St
Little Rock, AR 72201
501-312-8500
Fax: 501-312-8505
Email: hbates@cbplaw.com
Email: llowther@cbplaw.com

*Counsel for Plaintiff and the Proposed Class*